# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**UNITED STATES OF AMERICA**
*ex rel*. **JANE DOE,**

     **Plaintiffs,**

**vs.**           **Case No: 8:03-CV-1813-T-27TGW**

**JOSEPH DEGREGORIO,**
**ACCULAB LABORATORIES, INC.,**

     **Defendants.**

_____/

## ORDER

**IN THIS** Qui Tam action, the Government alleges a conspiracy to submit false and fraudulent claims under the False Claims Act, 31 U.S.C. § 3729(a)(3). (Dkt. 20).[1] Acculab Laboratories, Inc., and Joseph DeGregorio, Acculab's President and sole shareholder, are alleged, among other things,  to have engaged in a conspiracy to defraud the United States by seeking and receiving, or causing to be sought and received, payment of false and/or fraudulent claims submitted to Medicare.  DeGregorio is alleged to have participated in the conspiracy, knowing that claims submitted to Medicare through Acculab were false and fraudulent, resulting in payment to Acculab in excess of $17,000,000 by Medicare. (Dkt. 20, ¶ 41(3)).  Pursuant to the prejudgment remedies of the Federal Debt Collection Practices Act, Prejudgment Writs of Attachment and Sequestration were issued as to real property owned by DeGregorio individually.

_____

[1] Relator filed this qui tam action against Defendant Acculab Laboratories, Inc. ("Acculab") in August 2003, alleging that Acculab submitted false claims for payment for blood tests to Medicare and Tricare. (Dkt. 1).  The Government intervened in July 2006 and on November 2, 2006, filed an Amended Complaint against Defendants Acculab and Joseph DeGregorio. (Dkt. 20).

Before the Court is Defendant DeGregorio's Request for Hearing on the Notice of Prejudgment Writs of Attachment and Sequestration (Dkt. 30).[2]  In his Request for Hearing, DeGregorio argued that the Government had not established the "probable validity of the claim for a debt" and that the Government failed to establish that Defendant was about to assign, dispose or destroy property or convert his property into money with the effect of hindering, delaying or defrauding the Government.  *See* 28 U.S.C. § 3101(d)(2).[3]

The Court conducted an evidentiary hearing pursuant to 28 U.S.C. § 3101(d) on January 3, 4, and 5, 2007.  Upon consideration of the briefs, the evidence presented and argument of counsel, this Court finds that the United States has established the probable validity of its claim against DeGregorio and has complied with the statutory requirements for issuance of the prejudgment remedy granted.  This Court further finds that DeGregorio, as debtor, prior to issuance of the Writ, was about to dispose of real property owned by him and convert that property into money in a manner prejudicial to the United States with the effect of hindering, delaying, or defrauding the United States. The United States established a compelling need and exigent circumstances supporting prejudgment remedies to secure its claim of debt.  Defendant's request to quash the writs is accordingly DENIED.

---

[2] The parties have submitted Defendant DeGregorio's Brief in Preparation for Hearing on the Notice of Prejudgment Writs of Attachment and Sequestration (Dkt. 36), the United States of America's Memorandum in Support of Writs of Attachment (Dkt. 48), Defendant DeGregorio's Post-Hearing Brief in Opposition to the Issuance of Prejudgment Writs (Dkt. 63) and the United States of America's Post-Hearing Memorandum in Support of Prejudgment Writs (Dkt. 68).

[3] DeGregorio does not challenge the Government's compliance with the statutory requirements for issuance of the prejudgment remedy or contend that adequate alternative remedies exist.  *See* 28 U.S.C. § 3101(d)(2) (limiting the issues to be addressed at a post-deprivation hearing).

### The Complaint

The Amended Complaint alleges a conspiracy under the False Claims Act ("FCA") pursuant to 31 U.S.C. § 3729(a)(3) (Count I), claims for treble damages and civil penalties for violations of the False Claims Act pursuant to 31 U.S.C. §§ 3729(a)(1) and (a)(2)(Counts II, III and IV), unjust enrichment (Count V), payment by mistake of fact (Count VI), common law fraud (Count VII), and a claim for prejudgment and postjudgment remedies on a debt pursuant to the Federal Debt Collection Procedures Act ("FDCPA"), 28 U.S.C. § 3001, *et seq.* (Count VIII).

The Amended Complaint alleges that DeGregorio "submitted claims [] electronically to the Medicare Part B Program and through his wholly-owned corporation, Defendant Acculab" (Dkt. 20 at ¶ 30); "DeGregorio agreed in the electronic enrollment form application with Medicare, among other things, that DeGregorio would be responsible for all Medicare claims submitted to HCFA/CMS relating to Acculab's clinical laboratory services, . . . and that DeGregorio would submit claims that were accurate, complete and truthful" (*Id*.); that DeGregorio designed computer software programs that unbundled CPT codes and changed ICD-9 codes on claims submitted to Medicare in order to maximize reimbursement from the Medicare Program (*Id*. at ¶ 36); that DeGregorio fraudulently submitted claims for reimbursement that were never ordered by a physician or were in excess of what was ordered by a physician (*Id*. at ¶ 37); that by reason of these false submissions, the Government has been damaged by a loss of funds (*Id*. at ¶¶ 40, 46, 51, 56); and that as a result of these allegedly false submissions, DeGregorio has been unjustly enriched "in an as yet undetermined amount under circumstances where equity requires Defendants to repay Plaintiff those amounts of Medicare benefits paid to or on account of Defendants . . . ." (*Id*. at ¶ 59).

### The Application for Prejudgment Remedy

On November 30, 2006, the Government applied for prejudgment remedies in the form of writs of attachment and sequestration pursuant to the FDCPA.  The Government asserted reasonable cause to believe that  DeGregorio "is disposing of, or has disposed of, property with the effect of hindering the United States or is converting property into money or evidence of debt."  (Dkt. S-41 at p. 4-5); *see* 28 U.S.C. §§ 3101(b)(1)(B), (b)(1)(C).  Pursuant to the requirements of the FDCPA, the Government attached the Affidavit of Special Agent Patricia Allen. *See* 28 U.S.C. § 3101(c).  Allen investigated the suspected health care fraud violations during the eighteen months prior to her affidavit and avers that DeGregorio, who is currently imprisoned, listed four of his personally owned commercial properties for sale and was heard in monitored telephone calls making efforts to liquidate company assets.  (Allen Aff. at ¶¶ 70-71).

Allen further avers that "[m]y investigation reveals that Joseph DeGregorio, through his corporation, Acculab Laboratories, Inc., has bilked Medicare by systematically presenting or causing to be presented, false or fraudulent claims." (Allen Aff. at ¶ 4).  "Specifically, DeGregorio presented or caused to be presented, to Medicare for reimbursement, false billings which included unbundling, adding services not ordered by the referring physician, changing diagnosis codes, non-rendered services and medically unnecessary procedures . . . ." (*Id*.)

Allen's affidavit is largely based on interviews with confidential witnesses.  Confidential Witness Number 1 ("CW 1") stated that DeGregorio developed a software program that would make up a payable diagnosis code that Medicare would pay when a referring physician did not provide a diagnosis code on a lab requisition form.  (Allen Aff. at ¶ 27(a)).  The software program would generate a higher paying code if a doctor wrote a code on a lab requisition form that did not pay as

well as another.[4]  (*Id*. at ¶ 27(b)).  "In the beginning, DeGregorio also unbundled procedure codes."
(*Id*. at ¶ 27(d)).

Confidential Witness Number 2 ("CW 2"), formerly employed as an Acculab office manager, provided that "DeGregorio solely handled and administered all the Medicare billing." (Allen Aff. at ¶ 28(b)).  According to CW 2, the data entry clerks who input the Medicare billings actually believed they were conducting business but were just there "as a front and cover-up." (*Id*. at ¶ 28(c)).  "DeGregorio arrived at work late at night daily and downloaded the billing data from the billing entry clerks' computers, placed the data on a separate computer, then changed the codes.  DeGregorio altered the Medicare billing that the clerks recorded during the day." (*Id*. at ¶ 28(d)).  CW 2 indicated that two separate Medicare billing computers exist that do not match. (*Id*. at ¶ 28(e)).  In addition, several other confidential witnesses informed Agent Allen that they were instructed "by management" to alter diagnosis codes on lab requisition forms.  (*Id*. at ¶¶  30, 31, 32).

As a result of a 2003 audit of thirty-five of Acculab's Medicare claim submissions, all thirty-five reviewed claims were denied.[5]  Acculab admitted that it had an error in its billing computer coding for the time period covered by the audit.  (Allen Aff. at ¶ 40, Plaintiff's Ex. 2c).  Acculab admitted that "[t]he code for a direct LDL test was inadvertently used not only for direct LDL's but also for calculated LDL's." (*Id*.).  An April 25, 2006 audit performed on claims submitted in 2003 denied forty-eight out of sixty-four reviewed claims.  (Allen Aff. at ¶¶ 49-50).  Four of the sixty-two

---

[4] According to Agent Allen's hearing testimony, she has a copy of the computer program written by DeGregorio with respect to Medicare submissions.  Forensic examiners reviewed the written program and told Agent Allen that the program was written manually regarding Medicare and Medicare codes and diagnoses.  Agent Allen testified that the written code appeared to her to change diagnosis codes but she does not know whether the forensic examiners reached the same conclusion.

[5] Five claims were subsequently overturned in Acculab's favor.  (Allen Aff. at ¶ 44)

reviewed claims were denied due to unbundling services and seven of the sixty-two reviewed claims were denied because of conflicting information.  (Allen Aff. at ¶¶ 50, 54, 57).  A May 16, 2006 audit performed on beneficiary files with dates of service in 2004 denied thirty-two out of forty-nine claims.  (*Id*. at ¶ 62).  Six of the claims were denied due to conflicting information.  (*Id*. at ¶ 66).  The April and May audits concluded that the allegations of unbundling, adding services not ordered by the referring physician, changing diagnosis codes, and billing non-rendered services and medically unnecessary services were substantiated by the reviews.  (Plaintiff's Ex. 3 at p. 4, Ex. 4 at p. 6, Allen Aff. at ¶ 67).

Based on the Application and Allen's affidavit, a Writ of Attachment (Dkt. 45) and a Writ of Sequestration (Dkt. 46) were issued, encumbering seven parcels of real property owned by DeGregorio.[6]

## Discussion

The FDCPA provides the exclusive civil procedures for the United States "to obtain, before judgment on a claim for a debt, a remedy in connection with such claim."  28 U.S.C. § 3001(a)(2).  In order to obtain prejudgment remedies, the Government must include with its application an affidavit "establishing with particularity to the court's satisfaction facts supporting the probable validity of the claim for a debt and the right of the United States to recover what is demanded in the application."  28 U.S.C. § 3101(c).

## "Debt"

Preliminarily, Defendant argues that the Government cannot establish that it is owed a "debt"

---

[6] The Writ of Attachment was subsequently converted into Writs of Sequestration with respect to three of the properties, encumbering the proceeds of the sale of those properties. (*See* Dkts. 44, 45, 79, 82).

as that term is defined by the FDCPA. Defendant argues that "the Government's claims for fines and penalties in the First Amended Complaint do not fall within the FDCPA's definition of a claim for debt" and that the Government has not established that DeGregorio benefitted individually by any alleged overpayment made to Acculab. (Dkt. 36 at p. 3). The Government responds that the FDCPA provides that fines and penalties constitute "debt" within the meaning of the Act and that the Government has alleged individual wrongdoing by DeGregorio resulting in his unjust enrichment.

As noted, the FDCPA provides procedures for the United States to obtain a remedy *"before judgment on a claim for a debt."* *See* 28 U.S.C. § 3001(a)(2) (emphasis added). A "debtor" is defined as "a person who is liable for a debt or against whom there is a *claim for a debt.*" 28 U.S.C. § 3002(4) (emphasis added). A "[c]laim" is defined in subchapter D of the FDCPA as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 28 U.S.C. § 3301(3); *see also United States v. Lighthouse Disaster Relief*, Case No. 3:06-cv-00161-JJB-CN (M.D. La. July 11, 2006) (citing Black's Law Dictionary 264 (8th ed. 2004)) (finding a "claim" is a right that is asserted, not one that is agreed upon or that has already been determined in a judicial proceeding).[7] Further, 28 U.S.C. § 3002 defines "debt" to be, in part, "an amount that is owing to the United States on account of a fee, duty, lease, rent, service, sale of real or personal property, overpayment, fine, assessment, *penalty*, restitution, damages . . . ." (emphasis added).

---

[7] The Supreme Court denied certiorari in *Lighthouse Disaster Relief* on March 5, 2007. *See Lighthouse Disaster Relief v. United States*, 127 S.Ct. 1494 (2007).

It cannot be seriously disputed that a fraudulent or false statement submitted to the Government, for the purpose of inducing payment of government funds, supports a cause of action under the False Claims Acts.  A claim is within the purview of the False Claims Act if it is grounded in fraud which might result in financial loss to the Government. *Peterson v. Weinberger,* 508 F.2d 45, 52-53 (5th Cir. 1975), *cert. denied*, 423 U.S. 830 (1975).  The remedial nature of the False Claims statute "reaches beyond 'claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money." *United States v. Neifert-White Co.*, 390 U.S. 228, 233 (1968). "These provisions, considered together, indicate a purpose to reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government." *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 544-45 (1943).  Accordingly, if DeGregorio is shown to have submitted fraudulent claims for payment to Medicare, the Government has a right to payment (or claim) for the overpayment (debt) at the time the overpayments were made, even though no judgment had yet been rendered, and the Government has a claim against DeGregorio under the statute.

Defendant relies on *United States v. Cap Quality Care, Inc.*, 400 F. Supp. 2d 295 (D. Me. 2005) in arguing that the Government's claim for fines and penalties do not constitute "debt." Defendant's reliance is misplaced.  There, where the complaint alleged violations of controlled substance statutes and the federal Medicaid program, the court questioned whether "the mere filing of a claim for fines and penalties justifies the imposition of remedies under FDCPA," but ultimately concluded that the government's allegations of overpayments under the Medicaid program established reasonable cause to believe that the amount "is owing on account of . . . overpayment by

the government" so as to come within the statute.[8]  *Id.* at 299 (citing 28 U.S.C. § 3002(3)(B)).

Moreover, the plain language of § 3002 includes "penalties" in the definition of "debt."  Statutory

penalties therefore constitute "an amount owing" or "debt" under the statute. *Board of Governors*

*v. Pharaon*, 169 F.3d 110, 114-13 (2d Cir. 1999).  DeGregorio's argument to the contrary is without

merit.

Treble damages under the False Claims Act likewise constitutes "debt."  The Act expressly

provides for trebling of actual damages sustained by the Government as a result of overpayment.

*See* 31 U.S.C. § 3729(a).  Accordingly, like the claims in *United States v. Cap Quality Care, Inc.*,

400 F. Supp. 2d 295 (D. Me. 2005), the Government's claims here fall within the FDCPA's

definition of a claim for a "debt," an amount owing on account of an overpayment by the

Government.   The statutory penalties sought by the Government in connection with the

overpayments are also properly characterized as "debt."  *See* 28 U.S.C. § 3002.  Accordingly, the

Government has a claim for a debt as contemplated by the FDCPA. *See United States v. Teeven*, 862

F. Supp. 1200, 1225 (D. Del. 1992)(denying a motion to quash prejudgment writs issued pursuant

to the FDCPA in a case brought under the False Claims Act and the common law); *see also United*

*States v. Raymond & Whitcomb Co.*, 53 F. Supp. 2d 436, 443 (S.D. N.Y. 1999)(finding that a claim

by the Government for unpaid postage supports a claim under the FDCPA for a "debt" as defined);

*United States v. Dickerson*, 790 F. Supp. 1583, 1585 (M.D. Ga. 1992)(finding a CERCLA action by

the Government to recover costs incurred in conducting a Superfund cleanup of hazardous waste was

---

[8] The court nevertheless denied the government's request for prejudgment relief for two reasons.  *Id.* at 300.
First, the court concluded that the government's allegation that the defendant was funding a consultant's attorney's fees
did not establish that the defendant was "mismanaging" its property such that a receiver should be appointed. *Id.*  Second,
the Court concluded that the government failed to show the amount by which the alleged overpayment exceeded "the
aggregate value of the nonexempt interest of the defendant in any property otherwise available to secure the alleged
debt." *Id.*

an action on "a claim for a debt").

DeGregorio argues that he did not benefit individually by the alleged overpayments. This argument has no bearing, however, on the probable validity of the Government's claim for a debt pursuant to the False Claims Act. *See Scolnick v. United States*, 331 F.2d 598, 599 (1st Cir. 1964)(direct personal benefits to the defendant are not required in a claim brought under the False Claims Act); *United States v. R&F Prop. of Lake County, Inc.*, 433 F.3d 1349, 1355 (11th Cir. 2005) (the three elements of a cause of action under the False Claims Act are (1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false).

As discussed below, the Government has established the probable validity of its claim against DeGregorio individually, based on information obtained from the confidential witnesses and three audits of Acculab. Accordingly, the Government has a claim for a debt against DeGregorio individually.

### Probable Validity of the Claim

Defendant contends that the Government has not established with particularity the probable validity of its claim for a debt. In contrast, the Government asserts that Defendant must come forward with affirmative evidence to contest the grounds on which the *ex parte* writs were granted. The Government, relying on Allen's affidavit, responds that by virtue of the issuance of the prejudgment writs, it has established the probable validity of its claim and argues that DeGregorio has not presented any affirmative evidence to rebut that showing.

In order to establish a claim under the False Claims Act, the Government must establish that DeGregorio either "(1) knowingly present[ed] or cause[d] to be presented, to an officer or employee

of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval" or "(2) knowingly ma[de], use[d] or cause[d] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. §§ 3729(a)(1), (a)(2).  The term "knowingly" means that a person has actual knowledge of the information, acts in deliberate ignorance of the truth or falsity of the information or acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b).  In evaluating probable validity, the "totality of the circumstances" are considered.  *United States v. Teeven*, 862 F. Supp. 1200, 1218 n.24 (D. Del. 1992).  When viewing the totality of the evidence presented by the Government, this Court finds that the Government has established with the requisite particularity the probable validity of its claim for a debt.  Defendant's challenge to the credibility of the confidential witnesses and the reliability of the information Allen relied on notwithstanding, Defendant has not carried his burden of placing in dispute the probable validity of the Government's claim for the debt.

In *Teeven*, burden shifting under the FDCPA was discussed.  The Court found that ". . . at the post-deprivation hearing, the debtor must affirmatively show cause as to why the writs should be quashed."  *Id.* at 1211.  "[A]t the hearing the Defendant bears the initial burden of placing the Government's showing of the probable validity of the debt in dispute."  *Id.* at 1216.  This Court agrees with DeGregorio that he need not present affirmative evidence to successfully challenge the Government's showing.  His statutory burden at the post-deprivation hearing is to place in dispute the Government's showing of probable validity.  He may do so through cross-examination of the affiant or other witnesses relied on by the Government.  Where, for example, the Government's affidavit is not based on personal knowledge and the reliability of the source of information is not

established, a defendant could successfully place in dispute the Government's showing of probable validity.

Where, however, as here, Allen's affidavit is sufficiently particularized and her sources of information are shown to be reliable because they have personal knowledge of the events about which they provided information, DeGregorio must come forward with affirmative evidence to rebut the Government's showing, that is, "some substantive evidence at the hearing." *Id*. at 1218. He did not. Defendant has failed to place in dispute the Government's showing of probable validity.

Defendant introduced the testimony of Michael Cromwell, who was employed by Acculab since May 1995. He gave background information regarding the nature of Acculab's business. Cromwell's testimony does not place the Government's showing of probable validity in dispute. He described the process and procedure followed at Acculab by phlebotomists when collecting blood samples, clerks who entered data, and Acculab's client services review of that data. Cromwell testified that an opportunity for error existed at each stage. According to Cromwell, the Acculab software was not able to assign different codes and did not unbundle codes. He admitted, however, that he never inspected the software. Cromwell never saw anything to suggest that DeGregorio was altering information submitted to Medicare. Notwithstanding this testimony, there was conflicting information from individuals with personal knowledge implicating DeGregorio in the alleged scheme to defraud.

DeGregorio wrote and designed the software utilized at Acculab. He had full access to the computers and was observed by CW 2 downloading and transferring data to his personal computer. He was in charge of Medicare billing. At least three witnesses, Relator, CW 1 and CW 2, who formerly worked in management at Acculab, had observed DeGregorio change billing codes and

12

personally submit Medicare claims.  CWs 1 and 2 saw DeGregorio change billing codes at night.

Several individuals had been instructed by Lettie Moreno, an Acculab supervisor, to change codes.[9]

Another witness, CW 6, had been instructed by Moreno to make changes to billing codes and to

enter payable codes where no diagnosis had been included.   Notwithstanding the criminal

background of CW 1, which Agent Allen was aware of, the information provided by the several

confidential witnesses corroborated much of the information CW 1 provided.   Several of the

confidential witnesses, some of whom were supervisors, confirmed Relator's statements that

management had instructed employees to change codes.  The confidential witness employees were

employed at different draw stations but were all supervised by Lettie Moreno.  Relator identified for

Agent Allen lab requisition forms which contained false claims.

### Individual Liability

Defendant argues that the Relator does not implicate DeGregorio individually in the alleged

fraudulent coding of Medicare submission forms.[10]  Defendant argues that the Government relies on

only two uncorroborated confidential witnesses, CW 1 and CW 2, to establish that DeGregorio

---

[9] Agent Allen testified that Moreno denied instructing employees to alter codes and denied that DeGregorio directed her to instruct the employees to do so.

[10] Defendant does not challenge the Government's showing with respect to DeGregorio's individual liability as a corporate officer for overpayments made to Acculab. Generally, under the doctrine of limited liability, the owner of a corporation is not liable for the corporation's debts. Creditors of the corporation have recourse only against the corporation itself, not against its officers or shareholders. The most common equitable exception to this doctrine of limited liability is for fraud. *United States v. Jon-T Chemicals, Inc.*, 768 F.2d 686, 691 (5th Cir. 1985), *cert. denied*, 475 U.S. 1014 (1986).  The Amended Complaint does not allege individual liability based on corporate alter ego or any other piercing of the corporate veil theory. *See United States v. Pisani*, 646 F.2d 83, 89 (3d Cir. 1981)(applying alter ego doctrine in Medicare fraud case to pierce corporate veil).  Notwithstanding, the Amended Complaint is replete with allegations of fraud perpetrated by DeGregorio individually, through Acculab.  Based on the allegations and proof of DeGregorio's personal involvement in the fraud, this case does not involve veil piercing. *See United States ex. rel Haskins v. Omega Institute, Inc.*, 11 F. Supp. 2d 555, 562-65 (D. N.J. 1998).

individually violated the FCA.  Defendant argues that CW 1 is not credible and that CW 2's conclusory allegations are uncorroborated.  Defendant further argues that the audits cannot be used to corroborate the witnesses' allegations.  Essentially, Defendant argues that the Government has not carried its burden of proving scienter and Allen's affidavit does not demonstrate his personal knowledge and participation in the submission of false and fraudulent forms to Medicare.  In light of the evidence and reliability of the informational sources available to Agent Allen, DeGregorio's arguments are unpersuasive.

To show a violation of the False Claims Act, the evidence must demonstrate "guilty knowledge of a purpose on the part of (the defendant) to cheat the Government,"  or "knowledge or guilty intent."  *Peterson v. Weinberger*, 508 F.2d 45, 52-53 (5th Cir. 1975) (citations omitted).  The False Claims Act creates civil liability for making a false claim for payment by the government.  *McNutt ex rel. United States v. Haleyville Medical Supplies, Inc*., 423 F.3d 1256, 1259 (11th Cir. 2005).  "The submission of a [false] claim is . . . the sine qua non of a False Claims Act violation."  *United States ex rel. Clausen v. Lab. Corp. of America, Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002) (citation omitted).  "In the healthcare context . . . , '[t]he False Claims Act does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe.'" *United States ex rel. Atkins v. McInteer,* 470 F.3d 1350, 1357 (11th Cir. 2006).

Here, there is sufficient evidence to support the Government's showing of the probable validity of its claim that DeGregorio individually caused false Medicare claims to be submitted, utilizing his corporation, Acculab.  Defendant correctly points out that Agent Allen avers only that "Acculab management" instructed Relator and other former Acculab employees to change or fill in

14

diagnosis codes on lab requisition forms. (Allen Aff. at ¶¶ 20, 22, 30, 31, 32).  Notwithstanding the Relator's failure to implicate DeGregorio personally in those instructions, as discussed, two witnesses singled out DeGregorio individually, CW 1 and CW 2.  CW 1 implicated DeGregorio in developing a software program that would "make up" payable diagnosis codes and generate higher paying codes. (Allen Aff. at ¶ 27(b)).  In the 2003 audit of Acculab, a high percentage of reviewed claims were denied because documentation did not support the procedure code.[11] (*Id.* at ¶ 40).  While Defendant argues that a "lack of documentation" does not support the fraud allegations, in response to the audit, Acculab admitted an error in its computer billing coding.  Acculab stated that "[t]he code for a direct LDL test was inadvertently used not only for direct LDL's but also for calculated LDLs." (Plaintiff's Ex. 2c).  This evidence lends support to CW 1's assertion that software was designed to alter codes and generate higher paying codes.

Defendant argues that CW 1, whom Defendant believes to be John Smith, should be entirely discounted as he has a long criminal history including multiple convictions for Grand Theft Auto and Obtaining Substance by Fraud and his whereabouts are unknown by the Government.  Defendant argues that Smith has previously falsely implicated DeGregorio in another criminal violation only to subsequently recant.  (Dkt. 36 at p. 5).  Even without consideration of the testimony of CW 1 or the first audit, CW 2 implicates DeGregorio as the individual responsible for billing Medicare and as having altered the codes prior to submitting Medicare billings.  Although Defendant argues that Agent Allen did not specify in her affidavit how CW 2 learned of this information, Agent Allen testified that CW 2 personally observed DeGregorio performing those acts.  Although the

---

[11] The audit indicates for the vast majority of the individual beneficiaries reviewed that "[t]here was no laboratory requisition/order from the physician to the laboratory in the medical records."  (Plaintiff's Ex. 2 at pp. 12-26).

Government has not yet performed an analysis on the computers seized from Acculab,[12] the audits performed on Acculab support CW 2's assertion that codes were altered prior to submission for payment by Medicare.

The April 25, 2006 audit included a review of certain diagnosis codes in sixty-two claims for dates of service in 2003. (Allen Aff. at ¶ 49, Plaintiff's Ex. 3 at p. 2). Forty-eight of the sixty-two claims were denied. (*Id*. at ¶¶ 52-57). Seven of these were denied because of conflicting information.[13] (Plaintiff's Ex. 3 at p. 3). The audit concluded that Acculab unbundled services, added services not ordered by physicians, and rendered medically unnecessary services. (Allen Aff. at ¶ 60). Although not in Agent Allen's affidavit, it was established at the hearing that the April 25, 2006 audit also corroborated the allegations of diagnosis codes being changed. (Plaintiff's Ex. 3 at p. 4). This audit lends support to CW 2's assertion that codes were altered before claims were submitted for payment by Medicare in order to obtain larger payments.

The May 16, 2006 audit also corroborated the allegations of unbundling, adding services not ordered by the referring physician, changing diagnosis codes, billing non-rendered services and medically unnecessary services. (Allen Aff. at ¶ 67, Plaintiff's Ex. 4 at p. 6). This audit, performed on beneficiary files with dates of service in 2004, denied thirty-two out of forty-nine claims, six of which were denied due to conflicting information. (*Id*. at ¶ 66). This audit likewise lends support to CW 2's assertion that codes were altered before claims were submitted for payment by Medicare.

---

[12] When questioned about why the Government had not yet compared the computers seized from Acculab to confirm the testimony of CW 2, Agent Allen explained that a decision was made to allow the computers to be used in a state criminal case pending against DeGregorio.

[13] Agent Allen testified that the finding of claim denials based on conflicting information supported the finding that codes were changed.

Finally, Agent Allen testified that she obtained lab requisition forms from Acculab in which diagnosis codes had been changed or added on.  Agent Allen testified that she found over 100 such forms.  While counsel for Defendant pointed out at the hearing that this information was not contained in Allen's Affidavit, this does not place in dispute the Government's showing of probable validity.  Rather, it bolsters the Government's showing.

### Conversion of the Debtor's Property Into Money

Prejudgment remedies may be granted under the FDCPA if the Government shows reasonable cause to believe that the defendant "has or is about to assign, dispose, remove, conceal, ill treat, waste, or destroy property *with the effect of hindering, delaying, or defrauding the United States*" or "has or is about to convert the debtor's property into money . . . in a manner prejudicial to the United States *with the effect of hindering, delaying, or defrauding the United States*."  *See* 28 U.S.C. § 3101(b)(1)(B), (b)(1)(c) (emphasis added).  The Government has alleged this circumstance in this case.  (Dkt. S-41 at p. 4-5).

In her affidavit, Agent Allen avers that the affidavit of Detective Harris confirms her conclusion that DeGregorio and Acculab are attempting to avoid responsibility for their False Claims Act liability.  (Allen Aff. at ¶ 70).  Allen avers that Harris confirmed that DeGregorio has given instructions to sell his and Acculab's commercial property.  (*Id*.)  Detective Harris' affidavit avers that the monitoring of DeGregorio's phone calls from prison "reveals an effort by DeGregorio to liquidate the *company's* assets, including its fleet of automobiles and its real property."  (Harris Aff. at ¶ 4) (emphasis added).  Defendant argues that the Government has not alleged that DeGregorio is about to dispose of his *personal* property.  Allen avers in her affidavit, however, that DeGregorio has listed his personal real property for sale. (Allen Aff. at ¶ 70).

17

Accordingly, Defendant's argument that the Government has not alleged or established reasonable cause to believe that DeGregorio intended to liquidate his personal assets is unconvincing.  Further, the unencumbered sale of DeGregorio's personal properties would have the effect of hindering the recovery of debt by the Government as "[l]iquid assets are easily hidden." *See United States v. Teeven*, *supra*, at *8.

Finally, Defendant argues that the Government has not established that DeGregorio will be unable to pay a judgment rendered against him, separate and apart from the properties now subject to the writs.  All that is required by the FDCPA is that the Government show reasonable cause to believe that DeGregorio has or is about to convert his property into money in a manner prejudicial to the United States with the effect of hindering, delaying or defrauding the United States.  *See* 28 U.S.C. § 3101(b)(1)(c).  The Government has made that showing by establishing that the properties were listed for sale and that three sales have been consummated or will be consummated in the near future.  Further, Defendant has filed a pleading indicating that the equity in his real property is his only source of financial support (Dkt. 78).  There is no evidence disputing the Government's showing that the sale of these properties would hinder the Government's ability to collect on a judgment.

### Amount of the Debt

"Once the Government has satisfied the Court that there probably exists a debt, the onus is on the Defendant to show that the Government has seized more than is allegedly owed." *Teeven*, 862 F. Supp at 1212-13 (citing 28 U.S.C. § 3101(d)).  Under the False Claims Act any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval" is liable to the Government for

a civil penalty, treble damages, and costs. 31 U.S.C. § 3729(a). *See Cook County, Ill. v. United States ex rel. Chandler,* 538 U.S. 119 (2003).  The measure of damages the United States is entitled to recover under the FCA is the amount of money the government paid out by reason of the false claims over and above what it would have paid out if the claims had not been false or fraudulent. *United States ex rel. Marcus v. Hess,* 317 U.S. 537 (1943).  "FCA damages 'typically are liberally calculated to ensure that they afford the government complete indemnity for the injuries done it.'" *United States ex rel. Roby v. Boeing Co.,* 302 F.3d 637, 646 (6th Cir. 2002) (quoting *United States ex rel. Compton v. Midwest Specialties, Inc.,* 142 F.3d 296, 304 (6th Cir. 1998)).  The civil penalty the Government is entitled to recover is assessed for each false claim. 31 U.S.C. § 3729(a)(2).  Thus, the number of violations of the False Claims Act depends on the number of false or fraudulent claims or other requests for payments that defendant caused to be submitted.  The computation of damages does not have to be done with mathematical precision but, rather, may be based upon a reasonable estimate of the loss.

Defendant makes several arguments intended to show that the value of the properties seized exceeds any amount allegedly owed.  The writ of attachment encumbers three of DeGregorio's properties having a combined appraised value of approximately 1.4 million dollars.[14]  (See Dkt. S-45).  The writs of sequestration with respect to the three properties sold encumber sale proceeds of approximately $450,000.00. (See Dkts. 45, 79, 82).   Additionally, the writ of sequestration encumbers another parcel of real property appraised at $143,890.00 which was previously subject to foreclosure.  (Dkts. S-46; 88).  Accordingly, the value of encumbered assets is approximately two

---

[14] This represents the appraised values of the 1734 Northgate Blvd. property of $1,104,400.00; the 4107 N. Lockwood Ridge Road property of $99,000.00; and the 4464 Hidden River Road property of $256,200.00.  (Allen Aff. at ¶¶ 72, 74).

million dollars.  The Government seeks to recover at least $2,705,802.00 from DeGregorio.

Defendant challenges the use of the 2003 audit as a basis for the Government's estimated damages, arguing the audit denied claims for lack of supporting documentation rather than fraud. The Government presented evidence that in response to that audit, Acculab admitted that it had an error in its billing computer coding and ultimately paid the full amount of estimated overpayment. Accordingly, the Government's use of the 2003 audit findings in calculating an estimated recovery was not unreasonable.

While Agent Allen had difficulty responding to questions about her damages calculation premised on the 2003 audit, those calculations are clarified in her affidavit and in the Government's exhibits.  (Allen Aff. at ¶ 46).  The actual overpayment by Medicare for the denied claims was $442.92.  (Plaintiff's Ex. 2a).  As the audit reviewed only 35 claims out of 24,440, that figure was projected to $298,324.10 utilizing variable appraisal software to cover the total sampling frame. (*Id.*) This adjusted amount is $241,939.98. (Plaintiff's Ex. 2e).  Acculab paid Medicare that amount. (Plaintiff's Ex. 2c, Allen Aff. at ¶ 45).  Statutory penalties of $330,000.00 are based on a $11,000.00 penalty per denied claim.   The $483,880.00 figure is the trebled $241,939.98 overpayment projection, offset by Acculab's payment of $241,939.98.[15]  The total amount of estimated penalties and damages equals $813,880.00.

Defendant argues that the April 2006 audit cannot be included in the Government's estimated damages calculations because forty of the forty-eight denied claims were denied for failure to comply with administrative procedures and Agent Allen was unable to sufficiently explain the basis for her

---

[15] Actual damages are multiplied by the appropriate factor (ie. doubled or trebled) before deducting any payments made "because that method of computation most faithfully conforms to the language and purpose of the Act." *United States v. Bornstein*, 423 U.S. 303, 314 (1976).

calculations.  In the April 25, 2006 audit, forty-six of the sixty-two claims were denied and two additional claims were partially denied.  Of these denied claims, five claims were denied because no medical records were submitted or the required documentation was not submitted.  (Plaintiff's Ex. 3 at p.3).  However, nineteen were denied because there was no order by the physician. (*Id*.) Eight were denied because the documentation did not support the procedure billed. (*Id*.) Seven were denied because of conflicting information. (*Id*.)  Six were denied because the procedure billed was not in the medical record.  (*Id*.)

While DeGregorio characterizes the reasons for the denials as "administrative failures," the audit concluded that Acculab unbundled services, added services not ordered by physicians, rendered medically unnecessary services and changed diagnosis codes. These are the very allegations made by the Government in this False Claims Act case. (Plaintiff's Ex. 3 at p. 4).  Further, the calculations from this audit are explained in Agent Allen's affidavit.  An $11,000.00 statutory penalty was applied to the 48 denied claims, equaling $528,000.00.  The single damages for those claims extrapolated to the entire sampling frame, then trebled, total $898,956.00.  The total amount of estimated penalties and damages equals $1,426,956.00.

Finally, DeGreGorio argues that the May 2006 audit should not be used to estimate damages because the audited claims were similarly denied because of failures to comply with administrative procedures.  DeGregorio also argues that the audit did not conclude that Acculab or DeGregorio violated the FCA and Agent Allen was unable to adequately explain the basis for her calculations. While the May 2006 audit did not include any conclusions of FCA violations, it did substantiate the allegations of unbundling, adding services not ordered, changing diagnosis codes, billing for services not rendered, and billing for medically unnecessary services.  (Allen Aff. ¶ 67, Plaintiff's Ex. 4 at

p. 6).  Again, it was reasonable for the Government to use this audit in estimating its damages.  The

figures for this audit are appropriately laid out in the Allen Affidavit.  The estimate includes

$462,000.00 in statutory penalties, based on an $11,000.00 penalty for 42 claims actually denied and

trebled damages of $2,966.00, for a total of $464,966.00.[16]

The Government's damages estimate is conservative, with the exception of its contention that

it would be entitled to the maximum statutory penalty of $11,000.00 per claim.  The audits were not

comprehensive, having been performed on specific sample parameters.  It is likely that the

Government will be able to assert damages substantially greater than its current estimate, based on

$17 million in Medicare reimbursement to Acculab, and the reflected overpayment rate of more than

80%.  Regarding statutory penalties, at this stage of the proceedings, it is not feasible for the Court

to determine what statutory penalty the Government would be entitled to recover, whether it be

$5,500.00 or $11,000.00 per claim.  Suffice it to say that estimating recovery based on the maximum

penalty is not unreasonable, based on the description and scope of the alleged fraud.  Regardless, the

value of the encumbered properties is less than the Government's conservative estimate of the

amounts it expects to recover.

Defendant argues in his post-hearing brief that penalties should not be used in the calculation

of the claimed debt because they are not subject to the FDCPA.  The Court has determined that the

Government's claims against DeGregorio constitute a claim for a "debt" as contemplated by the

FDCPA and that the "debt" included statutory penalties. 28 U.S.C. § 3002(3).  Defendant argues

alternatively that the assessment of penalties, although mandatory under the False Claims Act, would

---

[16] The damages estimate for these denied claims was not projected to an entire sampling frame as the audit was performed on specific lab requisition forms provided by the Relator.  (Allen Aff. at ¶ 62).

be "excessive" and thus should not be used in the calculation of the claimed debt.

It would otherwise appear, because the Government is prosecuting this qui tam action, that the constitutional prohibition against excessive fines applies to this qui tam action. *See Austin v. United States,* 509 U.S. 602, 607 n.13 (1993):

> In *Browning-Ferris,* we left open the question whether the Excessive Fines Clause applies to qui tam actions in which a private party brings suit in the name of the United States and shares in the proceeds.(citation omitted).  Because the instant suit was prosecuted by the United States and because Austin's property was forfeited to the United States, we have no occasion to address that question here.

 The precise question remains open in this Circuit, however. *United States v. NEC Corp.,* 11 F.3d 136, 137 (11th Cir. 1993) ("It is manifest that the FCA is remedial with respect to the government's recovery against the defendant.").  In this Circuit, remedial penalties are not subject to excessive fine scrutiny.  *Cole v. U.S. Dept. of Agriculture, A.S.C.S.,* 133 F.3d 803, 807 (11th Cir. 1998):

> The Supreme Court has not articulated a comprehensive test to determine whether an in personam civil penalty violates the Excessive Fines Clause of the Eighth Amendment.  In *Austin v. United States*, which dealt with in rem civil forfeitures and the Excessive Fines Clause, the Court declined to set forth standards of "excessiveness." (citation omitted).  Although the Court has not defined the outer limits of acceptable fines, *Austin* did articulate a bright line rule in one category of cases: "[A] fine that serves purely remedial purposes cannot be considered 'excessive' in any event." (citation omitted).

Notwithstanding, the issue is not ripe for determination and has no bearing on whether the Government has made the requisite showing of probable validity of its claimed debt.  No penalties have been imposed against DeGregorio.  It is not appropriate, therefore, at this stage of the proceedings, to definitively address DeGregorio's argument.  In any event, given the remedial nature of the False Claims Act, it is unlikely that statutory penalties would constitute an excessive fine.

*United States v. NEC Corp.*, 11 F.3d at 139 ("The qui tam provisions are remedial and in no way act to penalize the FCA defendant.").

Lastly, Defendant argues that the amount of the claimed debt should be reduced by the anticipated recovery by the Relator, because that recovery will not inure directly to the Government's benefit. Section 3730 provides that a Relator may recover 15-25% of the proceeds in a qui tam action, "depending upon the extent to which the person substantially contributed to the prosecution of the action." That section also permits the court to "award such sums as it considers appropriate, but in no case more than 10 percent of the proceeds" in certain circumstances. Accordingly, and again in light of the conservative nature of the Government's estimated damages calculation for purposes of the prejudgment remedies, the Court declines to reduce the estimated recovery by any amount the Relator may receive.

Accordingly, Defendant DeGregorio's request to quash the writs is **DENIED**.

**DONE AND ORDERED** at Tampa, Florida, on this $27^{TL}$ day of April, 2007.

**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to:
Counsel of Record

24